IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

EDDIE LEE JINKS,                            )
                                            )
            Plaintiff,                      )
                                            )
      v.                                    )          CV 313-068
                                            )
JASON MEDLIN, Warden;                       )
JERRY MILES, Assistant Warden;              )
MICHAEL QUINN, Assistant Warden;            )
LATASHA HARRIS, Chief;                      )
PAT CLARK, Medical Director;                )
STEPHEN SMITH, Classification;              )
ERIC BRYANT, Chief;                         )
MYRTLE EVANS, Grievance Coordinator;        )
and GLENN POWELL, Unit Manager,             )
                                            )
            Defendants.                     )
_____

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
_____

Plaintiff, a former prisoner, brought the above-captioned case pursuant to 42 U.S.C. §
1983, concerning events alleged to have occurred at Wheeler Correctional Facility ("WCF")
in Alamo, Georgia. Before the Court are motions for summary judgment filed by all
Defendants. (Doc. nos. 71, 75.) For the reasons set forth below, the Court **REPORTS** and
**RECOMMENDS** that Defendants' motions be **GRANTED** (doc. nos. 71, 75), a final
judgment be entered in favor of Defendants, and this civil action be **CLOSED**. The Court
also **DIRECTS** the **CLERK** to **MODIFY** the docket to reflect that Defendant Powell's first
name is "Glenn." (See doc. no. 75.)

# I. PROCEDURAL BACKGROUND

Plaintiff, a prisoner at WCF from March 8, 2012 to November 2014, set forth ten claims in his amended complaint concerning a variety of issues, including most prominently that living conditions at WCF were so poor as to constitute cruel and unusual punishment. In his amended complaint, Plaintiff named the following Defendants: (1) Jason Medlin, Warden at WCF; (2) Jerry Miles; (3) Michael Quinn, Assistant Warden; (4) Latasha Harris, Chief of Security; (5) Pat Clark, Medical Director; (6) Stephen Smith, Classification Staff; (7) Eric Bryant, Unit Manager; (8) Myrtle Evans, Grievance Coordinator; and (9) Glenn Powell, Unit Manager. (See generally doc. no. 11.) Each Defendant is sued in their official and individual capacities. (Id. at 5.)

By Order dated March 24, 2014, United States District Judge Dudley H. Bowen, Jr., dismissed Plaintiff's following claims: (1) deliberate indifference to safety for being housed with gang members; (2) deliberate indifference to serious medical needs based on alleged delays in x-rays, medication refills, and physician appointments; (3) denial of procedural due process rights based on being placed in segregation without investigation or hearing; (4) cruel and unusual punishment for imposition of a co-payment for medication; (5) denial of access to the courts for inadequate materials in the law library, amount of time allowed in the library, and deficiencies in the mail system; and (6) official capacity claims for monetary relief. (Doc. no. 29.)

However, the undersigned also found that Plaintiff had arguably stated viable First Amendment claims against Defendants Medlin, Harris, and Evans for retaliation, based on allegations that, in response to Plaintiff filing a lawsuit against prison officials at Hays State Prison and filing grievances at WCF, these three Defendants acted as follows: (1) Defendant

Medlin placed Plaintiff in segregation and denied him visitation privileges based on a disciplinary charge for which Plaintiff was found not guilty, (2) Defendant Harris charged Plaintiff with a more serious offense than insubordination even though his conduct only constituted insubordination, and (3) Defendant Evans failed to allow Plaintiff to grieve his allegations of retaliation against Defendant Harris. (Id.; doc. no. 17, pp. 5-6.)

The undersigned further found that Plaintiff had arguably stated a viable Eight Amendment claim for conditions of confinement against all Defendants based on allegations of (1) insufficient laundry and personal hygiene materials, (2) inadequate food in unsanitary conditions, (3) inadequate time and space to exercise, (4) inadequate cell space due to overcrowding of the prison, (5) insufficient cleaning supplies, (6) unsanitary conditions in the cells and showers, (7) insufficient number of bathrooms, (8) unsafe drinking water, and (9) dangerous mold and mildew caused by leaks. (Doc. no. 17, pp. 6-7.)

## II.    STATE OF SUMMARY JUDGMENT RECORD

Where Plaintiff has failed to properly dispute a material fact in Defendants' statement, the Court has deemed that fact undisputed pursuant to Fed. R. Civ. P. 56(e) and Williams v. Slack, 438 F. App'x 848, 849 (11th Cir. 2011). Plaintiff's own summary judgment statements are insufficient to create issues of fact because they do not qualify as declarations or affidavits, (doc. nos. 79, 88). See Waddell v. Valley Forge Dental Associates, Inc., 276 F.3d 1275, 1279 (11th Cir. 2001); see also Holifield v. Reno, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (plaintiff's "conclusory assertions . . . , in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment"); Harris v. Ostrout, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where prisoner produces nothing beyond "his own conclusory allegations" challenging actions of

the defendants); <u>Fullman v. Graddick</u>, 739 F.2d 553, 557 (11th Cir. 1984) ("mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment").

Plaintiff's version of events do make their way into the summary judgment record, however, because Defendants submitted Plaintiff's deposition testimony, and the amended complaint qualifies as a declaration because it is dated and submitted under penalty of perjury, (doc. no. 11, p. 6.). <u>See</u> <u>Moulds v. Bullard</u>, 345 Fed.Appx. 387, 391 (11th Cir. 2009) ("specific facts pled in a sworn complaint must be considered in opposition to summary judgment"); <u>see also</u> 28.U.S.C. § 1746 (permitting consideration of declarations that are dated and stated to be true under penalty of perjury).

## III.   FACTS

### A.   Retaliation Claims

#### 1.   Retaliatory Segregation in the Fall of 2012

Plaintiff testified at his December 17, 2014 deposition that Warden Medlin locked him in segregation on two "frivolous" charges so that he could not work on (1) an appeal in a civil rights case filed in the Northern District of Georgia against prison officials at Hays State Prison in Trion, Georgia; and (2) a state habeas corpus action pending in the Superior Court of Coffee County.   (<u>See</u> Jinks Dep., p. 8, lines 12-13, p. 10, lines 1-8, p. 12, lines 1-4; doc. no. 75-2, pp. 46-56, 61-66, Exs. J. and L; doc. no. 11, p. 11.)

It is undisputed that Plaintiff was in administrative segregation from August 16, 2012 through September 4, 2012, and September 28, 2012 through November 6, 2012.  (Doc. no. 75, pp. 5-6.)  During the first stint, Plaintiff had a deadline of August 28, 2012 in the civil rights case to file a brief in the Eleventh Circuit Court of Appeals, in support of his appeal from the grant of summary judgment.  (Ex. J.)  As to the habeas case, Plaintiff had a hearing

on November 7, 2012, the day after Plaintiff completed the second stint in administrative segregation. (Ex. L.)

The dockets from these two cases do not show that Plaintiff was prejudiced by either stint in segregation. While Plaintiff did not timely submit his appellate brief in the civil rights case, such that the Eleventh Circuit dismissed the appeal, the Eleventh Circuit promptly granted Plaintiff's motion to reinstate his appeal on December 12, 2012. See Order: Motion to Reinstate Appeal, Jinks v. Matthews, No. 12-10958 (11th Cir. Dec. 12, 2012). Furthermore, in his motion to reinstate dated October 15, 2012, Plaintiff made no mention of placement in segregation, but instead blamed his failure to timely submit the brief on the allegation that he did not receive the order setting the briefing deadlines until early October. See Motion to Reinstate Appeal, Jinks v. Matthews, No. 12-10958 (11th Cir. Oct. 25, 2012). On April 30, 2013, the Eleventh Circuit reviewed the case on the merits and affirmed the grant of summary judgment to Defendants. (Ex. J.) As to the habeas case, Plaintiff was able to attend the evidentiary hearing on November 7, 2012, and Superior Court Judge Clarence Blount issued an order dated May 2, 2013 that denied Plaintiff's habeas petition on the merits. (Ex. L.)

Defendants declare that, rather than attempting to frustrate Plaintiff's ability to work on these cases, they placed Plaintiff in administrative segregation solely because he was twice charged with the high-level offense of insubordination in August and September, 2012. (Decl. Medlin ¶¶ 4, 6, 10; Decl. Harris ¶ 6; see doc. no. 75, pp. 5-6.) It is undisputed that prison officials who are not Defendants initiated those two charges against Plaintiff. They were not anomalies, as it is also undisputed that Plaintiff faced a slew of additional disciplinary charges at WCF, including: (1) failure to follow instructions; (2) verbal

threatening; (3) exposure; (4) assault on another prisoner; and (5) three additional charges of insubordination on May 19, 2012, December 10, 2012, and June 21, 2013. (Decl. Harris ¶ 6.)

It is also undisputed that a prisoner's placement in nonpunitive segregation, pending investigation of a disciplinary charge, is consistent with and required by established policies and practices at WCF. Frontline officers and supervisors who observe prohibited conduct report it in the form of a disciplinary charge. (Decl. Medlin ¶ 6.) A supervisor reviews the disciplinary charge and recommends whether it goes forward. (Id.) The prisoner is automatically placed in administrative, nonpunitive segregation pending investigation and a hearing. (Id.) If the supervisor recommends that the charge proceed, information is gathered for a hearing officer and the charged prisoner has an opportunity to respond. (Id.) The hearing officer may dismiss the charge for a number of reasons, including: (1) a finding of not guilty, (2) untimeliness, (3) insufficient evidence, and (4) the prisoner was charged with the wrong type of disciplinary charge. (Id.) If the prisoner is found guilty of the charge and the warden approves the final outcome, the prisoner may be transferred to disciplinary segregation and have some of his or her activities restricted. (Id.) Importantly, it is undisputed that Plaintiff, like all prisoners, had access to legal materials while in nonpunitive segregation pursuant to CCA Policy 14-08, which provides that prisoners are provided legal materials upon request. (Id. ¶ 9.)

Plaintiff testified at deposition that Warden Medlin was the person who locked him in segregation on two "frivolous" charges so that he could not work on his two cases. (Jinks Dep., p. 8, lines 12-13, p. 10, lines 1-8, p. 12, lines 1-4.) Plaintiff conceded at deposition, however, that Defendant Medlin did not write the two insubordination charges he

characterizes as frivolous that caused him to be placed in segregation from August to November. (Id. at 11, lines 24-25, p. 12, line 1.) When asked how Defendant Medlin knew about the two cases he was purportedly attempting to sabotage, Plaintiff testified that he spoke with Defendant Medlin in early September 2012, after he was in segregation, and showed Defendant Medlin two court orders. (Id. at 10, lines 6-25, p. 11, line 1.) Plaintiff testified that one court order set his state habeas hearing for November 7, 2012, and the other court order was the District Court dismissal of his civil rights suit that was the subject of his appeal to the Eleventh Circuit. (Id. at 9, lines 1-14, p. 10, lines 20-24.) At odds with this testimony is the indisputable fact that Judge Blount did not issue a notice of the November 7 evidentiary hearing in the habeas case until October 15, 2012. (See Ex. L.)

## 2. Retaliatory Revocation of Visitation Privileges in December 2012

The amended complaint alleged that Defendant Medlin revoked Plaintiff's visitation rights in December 2012 despite Plaintiff being found not guilty of the underlying exposure charge. (Doc. no. 11, p. 12.) Plaintiff alleged that Defendant Medlin revoked his visitation rights to retaliate because of Plaintiff's civil rights suit against officials at Hays State Prison and because of grievances he filed at WCF. At deposition, Plaintiff testified that Defendant Medlin revoked his visitation privileges "for no reason" after "put[ting] false charges" on Plaintiff. (Jinks Dep., p. 21, lines 20-21.) Plaintiff never alleged or testified how long his visitation privileges were revoked. Defendant Medlin testified by declaration that, if he did in fact revoke Plaintiff's visitation rights in December 2012, he would have done so for management and security reasons and not in retaliation for any lawsuits or grievances. (Decl. Medlin ¶ 7.)

### 3. Retaliatory Segregation in March 2013 to Prevent Plaintiff's Attendance at Mother's Funeral

Plaintiff alleged that, when he tried to speak with Defendant Harris about his mother's poor health, she filed a disciplinary charge against Plaintiff and placed him in segregation from March 14, 2013 to March 26, 2014, which caused him to miss his mother's funeral. (Doc. no. 11, p. 12.) Plaintiff alleged that Defendant Harris committed these acts to retaliate against Plaintiff for filing the civil suit against officials at Hays State Prison and because of grievances he filed at WCF. (Id.) Plaintiff conceded he was insubordinate during the intense conversation with Defendant Harris regarding his mother's poor health, but alleged she acted inappropriately by asserting an unspecified charge that is more serious than insubordination. (Id.) Defendant Harris cannot recall the details of this disciplinary charge but categorically denies that she placed Plaintiff in segregation in response to his suit or grievances. (Decl. Harris ¶¶ 4-6.) Instead, Defendant Harris states that she only brought disciplinary charges because of offenses that she observed, and not in a bad faith attempt to retaliate against a prisoner for filing lawsuits and grievances. (Id.)

### 4. Refusal to Provide Appeal Form

Plaintiff submitted a grievance complaining about Defendant Harris's actions described above. (See Jinks Dep., p. 35, lines 20-24, p. 37 lines 24-25, p. 38, lines 1-8; see also doc. no. 1, pp. 58-59.) Defendant Evans, who was the grievance coordinator at WCF during this time, rejected the grievance for having more than one issue, for pertaining to a non-grievable issue, and because Plaintiff had already been released from segregation. (Decl. Evans ¶ 7.) Pursuant to the administrative grievance procedure, grievances are only allowed to pertain to a single issue or incident. (Id.; Evans Att. 2, p. 7.) Defendant Evans

recalls denying grievances for that reason alone. (Decl. Evans ¶ 7.) Once his grievance was denied, Plaintiff had seven days from the date he received the denial to file an appeal. (Id. ¶ 8; Evans Att. 2, p. 11.)

Plaintiff testified that Defendant Evans would not give him the form to appeal the rejection of the grievance because she said the issue had expired after he was released from segregation. (Jinks Dep., p. 39, lines 1-3.) Plaintiff testified that he guessed Defendant Evans "got skeptical" about his grievances against Defendants Medlin and Harris and "refused to allow [him] to grieve those issues." (Id. at 39, lines 14-21.)

It is undisputed that appeal forms are available to all prisoners in the living unit and in segregation. (Decl. Evans ¶ 8; Evans Att. 2, pp. 4, 11-12.) If Plaintiff had filled out, signed, and given the appeal form to his counselor more than seven days after his grievance was denied, the Central Appeals Office could have waived the seven-day time limit for good cause. (Decl. Evans ¶ 8; Evans Att. 2, p. 11.)

**B.     Conditions of Confinement Claim**

**1.     Laundry**

The amended complaint claimed that Plaintiff was denied sufficient laundry privileges because his clothes were only washed twice a week, his bedding was only washed once a week, his clothes came back dirtier after being laundered, and his clothes were not bleached or put in other chemicals to fight off "HIV and other carrying diseases." (Doc. no. 11, p. 7.) At his deposition, Plaintiff testified that laundry came back "filthier" than when it was sent out, that prisoners ran the laundry, and that prisoners had to use their personal soap to wash their clothes and dry them on the rails of their cells. (Jinks Dep., pp. 14-15.)

Plaintiff testified that he tried to file a grievance about dirty clothing, but Defendant Evans would not let him.  (Id. at 26, lines 11-25, p. 33, lines 3-23.)

Plaintiff also submitted separate, identical declarations under penalty of perjury signed by him and purportedly five other prisoners on the same day, Roger Lee Baker, Jr., Earl Sutton, Randall Savage, David Theodore Bell, and Donald Lance, hereinafter referred to as the "Identical Declarations."  Each stated that "all units have two days to wash clothes and one day to wash sheets, and when wash the laundry dont come back clean [sic]."  (See doc. nos. 40-45.)  Plaintiff and each of these prisoners declared that they were, "[a]lso denied reasonable and minimum clothing."  (Id.)  However, the Identical Declarations did not state (1) whether they were discussing conditions at WCF, (2) if they were discussing WCF, when they were incarcerated at WCF, (3) whether the conditions they discussed occurred during the same relevant period as Plaintiff's amended complaint allegations, or (4) how often these conditions occurred.  (See id.)

On a related topic, the amended complaint alleged that Defendants Medlin, Quinn, Miles, Harris, Powell, and Evans denied Plaintiff a new set of clothing from November 7, 2012, until October 23, 2013.  (Doc. no. 11.)  At deposition, Plaintiff testified that he asked Defendant Evans to get him some clean clothes and she told him to talk to Defendant Powell, Plaintiff's unit manager at the time.  (Jinks Dep., p. 24, lines 4-23.)  Plaintiff testified that Defendant Evans provided clean clothing to some unnamed prisoners on an unknown date, but would not provide clean clothes to Plaintiff.  (Id. at 25-26.)  Plaintiff asked Defendant Powell to get some clothing for him, and testified that "somehow, [Defendant Powell] was deliberate indifference regarding the issue [sic]."  (Id. at 13, line 25, p. 14, lines 1-3.)  Plaintiff testified that prison officials conducted inspections to see the condition of prisoner

clothing, the prisoners' personal appearance, and whether the dormitory was cleaned. (<u>Id.</u> at 13, lines 15-22.)

In response, Defendants provide a detailed description of the prison laundry program. Prisoners place their dirty laundry in net bags that are collected and transported to laundry. (Decl. Medlin ¶ 8; Decl. Powell ¶ 4.) There, they are placed in commercial washers and dryers, with commercial laundry products, and then returned to the prisoners. (Decl. Medlin ¶ 8.) Periodically, Defendant Medlin would check the laundry during his daily prison tours, and never saw newly-laundered clothes that were dirty or smelled bad. (<u>Id.</u>) Defendant Powell, the unit manager, also never saw newly returned laundry that was unclean or unsanitary. (Decl. Powell ¶ 4.) Additionally, prisoners are issued a standard number of pants, shirts, and socks, and if these clothes wear out or are unusable through no fault of the prisoner, the prison replaces them. (Decl. Medlin ¶ 8.) However, prisoners frequently damage or alter their clothing intentionally. (<u>Id.</u>)

New clothing requests are handled at the unit level. (Decl. Powell ¶ 3.) Defendant Powell recalls that Plaintiff, unlike other prisoners, constantly demanded new clothing because he did not believe it was as clean as he wanted it to be. (<u>Id.</u>) If Plaintiff was wearing unclean or unsanitary clothing, or if he was missing items issued to him, Defendant Powell would have asked unit staff to see if he needed new items issued. (<u>Id.</u>) If Plaintiff had not damaged or disposed of clothing, then staff would have provided new items of clothing. (<u>Id.</u>) Nevertheless, Defendants Powell, Medlin, and Bryant never saw Plaintiff in unclean clothing or less than a full outfit. (Decl. Medlin ¶ 8; Decl. Powell ¶ 3; Decl. Bryant ¶ 6.)

## 2. Personal Hygiene Items

Plaintiff alleged in the amended complaint, and testified at his deposition, that he only received small amounts of soap, toothpaste, and deodorant on a weekly basis, which lasted only three days. (Doc. no. 11; Jinks Dep., pp. 14-15.) The Identical Declarations stated that indigent prisoners at WCF were issued a small bar of soap, a small tube of toothpaste, and a small bar of deodorant, but, as discussed above, the declarations lack critical and necessary details such as location, time period, and frequency of occurrence. (Doc. nos. 40-45.)

According to Defendant Medlin, the prison issues indigent prisoners, such as Plaintiff, free, basic hygiene items, including a toothbrush, soap, razors, and toothpaste. (Decl. Medlin ¶ 8.) A prison vendor supplies these free items in many Georgia prisons and other states. (Id.) The size and composition of the free supplies given to Plaintiff are the same as other prisoners at WCF and in other prisons. (Id.) Because they are free personal hygiene items, they are not intended to last for a long time and are reissued as needed by unit counselors. (Id.; Decl. Bryant ¶ 6.) Therefore, the size of these free items is not the same as commercial products available in drug or grocery stores. (Decl. Medlin ¶ 8.) However, larger personal hygiene items are available for purchase from the prison store. (Id.) Defendant Medlin states that he had to suspend razor blade issuance several times because of security problems due to prisoners misusing sharpened razor blades. (Id.) However, Defendant Medlin does not recall if Plaintiff was incarcerated at WCF during one of these periods, and even if he was present, the prisoners were still allowed to utilize sterilized clippers to shave. (Id.)

## 3. Food

Plaintiff alleged in the amended complaint that he received "food trays not up to the full level" and was thus denied "his 2,000 calories per serving a day of nutritional value to

preserve his health." (Doc. no. 11, p. 7.) The Identical Declarations stated that prisoners were denied 2,000 calories a day because the food trays were not up to the full level, but the declarations lack critical and necessary details such as location, time period, frequency of occurrence, and how they measured caloric intake. (Doc. nos. 40-45.)

Plaintiff also alleged the food was unsanitary, including moldy bread, tainted meats, food that had rat scratches on it, and "spoiled milk product in the summertime." (Doc. no. 11.) Further, the eating conditions were unsanitary; the trays and spoons still had food particles on them after being washed, the tables and chairs were dirty, and there were blowflies and roaches in the summer in the dining halls. (Id.) Likewise, the Identical Declarations stated the following issues: (1) meat was tainted because it was red on the inside and green on the outside, (2) bread was moldy, and (3) milk products were spoiled. (Doc. nos. 40-45.) They also stated that the "chow hall" had dirty tables, chairs, cups, spoons, and trays. (Id.) Once again, the Identical Declarations lack critical and necessary details such as location, time period, and frequency of occurrence. (See id.)

Defendants counter that WCF's food service is operated by a nationwide vendor that provides supplies, personnel, and cooks, and serves food with the aid of prisoner labor. (Decl. Medlin ¶ 8.) The amount of food served, and the menu, is carefully controlled to provide adequate nutrition and meets national guidelines for calorie intake and variety. (Id.) Indeed, some members of the prison staff also eat the same meals prepared in the same kitchens. (Id.) The prisoners routinely get approximately 2,000 calories per day on the standard WCF menu. (Id.) Furthermore, no CCA staff dictates the amount or condition of food that is served to prisoners. (Id.) Defendant Medlin inspected the kitchen and chow hall and did not see unsanitary or unsafe conditions. (Id.)

Additionally, the health department routinely conducts unannounced inspections and testing. (Id.) Defendants attach Georgia Department of Public Health inspection reports showing WCF received a grade of "A" in each of their biannual inspections in 2013 and 2014. (Doc. no. 75-2, pp. 67-70.) Moreover, WCF is subject to inspections by Corrections Corporation of America, audits by the American Correctional Association, and unannounced audits by the Georgia Department of Corrections. (Decl. Medlin ¶ 8.) A Georgia Department of Corrections contract monitor is physically located at the prison at all times and monitors these food conditions. (Id.) Additionally, Defendants attached monthly inspection and pest solution application reports from Allgood Pest Solutions showing that no rats were found at WCF. (Doc. no. 75-2, pp. 71-82.) Additionally, Defendant Bryant testifies that he had no role in food preparation or distribution, except as to lock down when prisoners were fed in their cells. (Decl. Bryant ¶ 6.)

### 4. Recreation

Plaintiff alleged in the amended complaint that he was denied reasonable and minimum outdoor recreation because he was allowed only two to three hours per week in a small yard that contained insufficient equipment and was overcrowded. (Doc. no. 11, p. 9.) The Identical Declarations stated the same, but, as discussed above, lack critical and necessary details such as location, time period, and frequency of occurrence. (Doc. nos. 40-45.)

Defendants respond with copious amounts of information about the recreation program at WCF. Every unit or dormitory at WCF has an attached, enclosed outside exercise area. (Decl. Medlin ¶ 8.) There is also a gym at WCF and a larger "yard" exercise area. (Id.) Prisoners are allowed to engage in sports such as basketball and soccer, and WCF

employs a coordinator whose sole job is to coordinate sports and activities. (Id.) In nonsegregation units, there are numerous chances to exercise at set times in the yards attached to the units and at other times in the main yard. (Decl. Bryant ¶ 6.) Because of the need for added security, prisoners housed in segregation do not exercise with the general population but instead use individual, fenced exercise areas which are similar to those in other prisons in Georgia and other states. (Decl. Medlin ¶ 8.) The fenced enclosure is necessary to protect prisoners in segregation from each other since these prisoners require heightened security precautions. (Id.) Prisoners in segregation are allowed at least an hour a day outside for exercise, if weather permits, and if there is no activity inside, such as cell searches or a disturbance that might conflict with the ordinary schedule. (Id.; Decl. Bryant ¶ 6.) If some event occurs that pulls staff away, exercise may be missed on isolated occasions, but this is not the rule. (Decl. Medlin ¶ 8.) Prisoners in general population have extensive outside exercise opportunities, and WCF's exercise facilities meet or vastly exceed what is available at other prisons in Georgia and other states. (Id.)

### 5.     Allegedly Inadequate and Unsanitary Cells, Showers, and Bathrooms

Plaintiff claimed that he was denied adequate shelter, sanitation, and safe drinking water, and that WCF had inadequate bed space, toilets that back up, and insufficient cleaning supplies and plumbing. (Doc. no. 11, p. 10.) Additionally, rain caused puddles to form in some units and there were leaks in certain hallways, both of which caused mildew and mold growth. (Id.) Further, sometimes the water was very brown and exposed Plaintiff to the risk of dysentery. (Id.) There were too few toilets, which caused long lines. (Id.) Relatedly, the understaffing and overcrowding required some staff to leave their posts and if the prisoner

had to use the restroom while they were gone, they would have to "urinate and defecate in the showers." (<u>Id.</u>)  This made conditions even more unsanitary when food had to be delivered to these units.  (<u>Id.</u>)

The Identical Declarations stated the following:  (1) sometimes prisoners urinated in the showers; (2) there were too few toilets, with three units each having five toilets and one urinal for eighty prisoners; (3) sometimes the water at the prison was brown; and (4) "certain units and hallways that leaks [sic] causing mildew and mold." (Doc. nos. 40-45.)  However, the Identical Declarations lack critical and necessary details such as location, time period, frequency of occurrence, and extent of leaking, molding, and mildew.  (<u>Id.</u>)

Plaintiff also testified that he complained about the following conditions in Unit 400 to Defendants Quinn and Bryant numerous times:  (1) mildew on the walls, (2) when it rains, there were leaks and they had to put mop buckets on the floor, but puddles still formed on the floor, (3) laundry came back dirty, (4) the hygiene soap given to prisoners did not last for more than three days, (5) prisoners had to use their hygiene soap to wash their clothes and put them on the rails of their cells.  (Jinks Dep., pp. 14-15.)  Plaintiff also testified that Defendant Bryant, who was above Defendant Quinn in the chain of command, "turned a blind eye to the situation." (<u>Id.</u> at 15-16.)  Plaintiff testified that he talked to Defendant Smith directly about the conditions in Unit 400, and Smith did not put him in other units where these conditions did not exist.  (<u>Id.</u> at 16-17.)  Plaintiff testified that Defendant Miles was "personally involved" with his conditions of confinement because he talked to Defendant Miles "numerous [sic] of times" about the conditions and he failed to do anything about the situation.  (<u>Id.</u> at 20, lines 5-15.)

In response to these broad, far-ranging allegations Defendants submitted copious amounts of detailed information, as follows.

### 6.    Cleaning Supplies and Cell Conditions

WCF issues cleaning products that are standard issue in the prison industry to prisoners in individual cells, who are required to clean and maintain cells themselves. (Decl. Medlin ¶ 8; Decl. Bryant ¶ 6.) Because of the population and confined areas, WCF cannot issue the same cleaning supplies that would be available at home, but the amount and nature of the supplies issued to the prisoners in cell houses are sufficient to clean that limited area. (Decl. Medlin ¶ 8.) Prisoners do not have unlimited access to bulk supplies that might be used to injure staff or other prisoners. (Id.) Common areas are maintained by prisoners that WCF assigns as orderlies and inspected daily by Defendant Medlin or an on-duty officer. (Id.; Decl. Smith ¶ 3.) In open dormitories, prisoners have to maintain the immediate area of their bunks, but orderlies clean the common areas, which are also inspected daily. (Decl. Medlin ¶ 8; Decl. Bryant ¶ 6.) Defendant Medlin has not observed unclean conditions, but when areas are not clean upon inspection, they are remedied. (Decl. Medlin ¶ 6.) Defendant Bryant, Unit Manager, also does not recall Plaintiff complaining to him about not having cleaning supplies. (Decl. Bryant ¶ 6.)

### 7.    Shower Conditions

All cell houses and open dormitories have showers. (Decl. Medlin ¶ 8.) Dorm areas normally have showers made private by curtains and dividers and are adjacent to sinks and toilets. (Id.) Cell houses have showers secured by doors. (Id.) These showers are inspected frequently. (Id.) There have been occasions when prisoners have improperly used the showers and, when discovered, the showers were cleaned and not ignored. (Id.; Decl. Bryant

¶ 6.)  Defendant Bryant, Unit Manager, testified that Plaintiff was never placed in an unclean shower.  (Decl. Bryant ¶ 6.)  Defendant Medlin has not seen unclean and unsafe shower conditions that were not remedied.  (Decl. Medlin ¶ 8.)

### 8.    Number of Bathrooms

Open dormitories have a common open bathroom area with toilets, separated by a wall from the dormitory.  (Id.)  Although there are not enough toilets for every prisoner to use them at once, Defendant Medlin testifies there are a sufficient number of toilets for the number of prisoners in the dormitory, comparable to a college dormitory or high school gym or bathroom.  (Id.; Decl. Bryant ¶ 6.)  Each single cell has a toilet and a sink for either one or two occupants.  (Decl. Medlin ¶ 8.)  Defendant Medlin testifies he is not aware of the ratio of toilets to prisoners being inadequate.  (Id.)  As to the number of bathrooms being insufficient because the prison is purportedly overcrowded, WCF is under its capacity.  (Decl. Bryant ¶ 6.)

### 9.    Drinking Water

The water at the prison is the same water used by the citizens of Alamo, Georgia, the town in which the prison is located, and is purchased from the city.  (Id.)  The water for the prison and city is inspected by the health department, and the health department never told Defendant Medlin that the water in the city or at WCF was not safe to drink.  (Id.) Defendants attach the results of a recent water sample bacteriological analysis showing that the water was absent of any fecal coliform or E. coli.  (Doc. no. 75-2, p. 83.)  Defendants Medlin and Bryant testify they saw the drinking water daily, drank the water, and did not see brown water.  (Decl. Medlin ¶ 8; Decl. Bryant ¶ 6.)  However, just as with civilian facilities, there may have been occasions when the maintenance staff worked on the water system and

the water color might have been impacted immediately after.  (Decl. Medlin ¶ 8.)

### 10.    Leaks, Mold, and Mildew in Unit 400

Defendant Medlin toured the unit frequently, if not daily, as did other management staff, and would have directed the maintenance department to fix any leaks had he seen mold or mildew.  (Id.)  The prison is (1) inspected on a daily basis by staff, (2) routinely examined by maintenance staff, (3) subject to CCA inspection and audits, (4) subject to unannounced audits and inspections by the Georgia Department of Corrections, and (5) monitored by a full-time, onsite Georgia Department of Corrections inspector.   (Decl. Powell ¶ 5.) Defendants Medlin and Powell testify that this does not mean there was never a leak in the prison facility, but allowing leaks from any source would damage the property and would not have been allowed.  (Decl. Medlin ¶ 8; Decl. Powell ¶ 5.)  Nevertheless, there would have been only two sources of leaks, the roof or pipes.  (Decl. Medlin ¶ 8.)  Plaintiff could not have seen any pipes because all piping is located in a pipe chase behind the cell or dormitory walls in areas not accessible to prisoners for security reasons.  (Id.)  Unit Managers Defendants Bryant and Powell do not recall any condition going unrepaired or there being mold and mildew in prisoner areas in Unit 400.  (Decl. Powell ¶ 5; Decl. Bryant ¶ 6.) Plaintiff does not contend he ever suffered any medical injury or condition from a leak.  (See doc. no. 11.)

### 11.    Plaintiff's Medical Condition

Pat Clark, Health Services Administrator at WCF, states that medical staff keeps records of each prisoner's medical records.  (Decl. Clark ¶¶ 2, 3.)  Medical staff members routinely rely upon the accuracy of a prisoner's medical record.  (Id. ¶ 3.)  Medical staff members are trained in record keeping and are familiar with how they prepare and keep the

19

medical records.  (Id.)  The records are kept in the ordinary course of medical care and all entries are made at or near the time of the events described in the record by a person with knowledge of the medical encounter or event.  (Id.)  Plaintiff's medical records contain no objective findings of illness or injury from the effects of the any of the conditions of confinement allegations, including:  (1) unclean laundry, (2) insufficient personal hygiene items, including toothbrushes and toothpaste, (3) inadequate food, (4) unsanitary food conditions, inadequate time and space to exercise, (5) inadequate cell space because of overcrowding, (6) insufficient cleaning supplies, (7) unsanitary conditions in his cell and in showers, (8) insufficient number of bathrooms, (9) unsafe drinking water, and (10) dangerous mold or mildew caused by leaks in Unit 400.  (Id. ¶ 5.)

### 12.  Housing Assignments

Defendant Smith, Classification Supervisor, recalls Plaintiff being a constant complainer about everything, including his cell conditions.  (Decl. Smith ¶ 3.)  Defendant Smith never saw conditions in any unit occupied by Plaintiff that he believed were unsafe or unhealthy, and Defendant Smith's impression was that Plaintiff was attempting to manipulate his housing and every other aspect of his prison life.  (Id.)  However, prisoners frequently attempt to manipulate their housing and every other aspect of their prison life, so this did not make one prisoner stand out from any other.  (Id.)  The very nature of security in a facility housing felony prisoners requires that the classification committee not let prisoners influence housing assignments because it encourages the movement of contraband and raises risks of prisoners being placed near others with whom there is a conflict.  (Id. at 4.)

Plaintiff was not punished for his complaining.  (Id. at 3.)  Instead, the prison classification committee decides housing assignment based on the needs of the institution,

bed space availability, programs, security levels, and the general requirements of the prisoners. (Id. ¶ 4.) Likewise, the classification committee recommended where Plaintiff be housed based on available space and his own conduct, which included consideration that he was in and out of segregation a number of times. (Id.) None of the decisions concerning Plaintiff's housing assignment in which Defendant Smith had any involvement as a member of the classification committee was related in any way to whether he had complaints about the prison, filed grievances, or had ever filed a prison lawsuit. (Id.)

## IV. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). If the burden of proof at trial rests with the movant, to prevail at summary judgment, the movant must show that, "on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) (*en banc*). On the other hand, if the non-moving party has the burden of proof at trial, the movant may prevail at summary judgment either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof. Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Id. at 608. The non-moving party cannot carry its burden by relying on the

pleadings or by repeating conclusory allegations contained in the complaint.  Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).  Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (quoting Adickes, 398 U.S. at 158-59).  A genuine dispute as to a material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.

### B.     Motion for Summary Judgment Filed by Defendant Evans

### 1.     No Reasonable Juror Could Find that Defendant Evans Retaliated Against Plaintiff by Refusing to Provide a Grievance Appeal Form.

Plaintiff alleged Defendant Evans refused to give him an appeal form when his grievance about the alleged retaliatory actions of Defendant Harris was rejected because Defendant Evans did not want Plaintiff to be able to appeal the rejection.  To prevail on a retaliation claim, Plaintiff must establish that:  (1) his speech was constitutionally protected; (2) he suffered adverse action that would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the adverse action and the protected speech.  O'Bryant v. Finch, 637 F.3d 1207, 1212 (11th Cir. 2011).

The causation prong "asks whether the defendants were subjectively motivated" by the plaintiff's protected speech.  Moulds v. Bullard, 345 F. App'x 387, 393 (11th Cir. 2009) (citing Smith v. Mosley, 532 F.3d 1270, 1278 (11th Cir. 2008)).  Under the subjective motivation prong:

> [O]nce the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on

his motion for judgment as a matter of law or prior to trial on summary judgment.

Smith, 532 F.3d at 1278 (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)).  "[T]he question for the court under Mt. Healthy [becomes] whether a reasonable fact finder, a jury, would have to find that the defendants would have [taken the adverse action against plaintiff] 'even in the absence of the protected conduct.'"  Id. at 1279.

Here, the undisputed facts show that Plaintiff cannot satisfy the second and third elements of a First Amendment retaliation claim against Defendant Evans.  First, Plaintiff was engaging in protected speech because "a prisoner's filing of a grievance concerning the conditions of his imprisonment is protected speech under the First Amendment."  Stallworth v. Tyson, 578 F. App'x 948, 950 (11th Cir. 2014).  Second, even assuming that Defendant Evans refused to give Plaintiff an appeal form, Plaintiff has not alleged that he suffered an adverse action as a result.  Indeed, Plaintiff could have obtained an appeal form on his own because it is undisputed that grievance appeal forms were available to all prisoners in the living unit and in segregation.  (Decl. Evans ¶ 8; Evans Att. 2, pp. 4, 11-12.)

Third, there is no evidence of a causal relationship between Plaintiff's filing of a grievance and the actions he alleges to be retaliatory.  Plaintiff testified that he is merely "guess[ing]" Defendant Evans "got skeptical" about his grievances against Defendant Harris and "refused to allow [him] to grieve those issues," (Jinks Dep., p. 39, lines 14-21).  This speculation falls far short of the evidence needed to satisfy this element at summary judgment.  See O'Bryant, 637 F.3d at 1219 (holding plaintiff's retaliation claim failed because plaintiff had not presented evidence of retaliatory animus); Harris v. Ostrout, 65 F.3d 912, 916 (11th Cir. 1995) (affirming summary judgment for defendant because plaintiff

"produced nothing beyond his own conclusory allegations suggesting that [defendant's] actions . . . were motivated by retaliatory animus); Smith, 532 F.3d at 1278 (holding plaintiff must show defendant was subjectively motivated by plaintiff's protected speech to prevail on retaliation claim).

Accordingly, when drawing all justifiable inferences in Plaintiff's favor, no genuine issue of material fact remains as to Plaintiff's First Amendment retaliation claim against Defendant Evans, and she is entitled to summary judgment on this claim.

> **2.** **No Reasonable Juror Could Find that Plaintiff's Dirty Clothing Posed an Unreasonable Risk of Serious Damage to His Future Health or Safety, that Defendant Evans Was Responsible for Ensuring Plaintiff Had Clean Clothes, or that She Was Deliberately Indifferent to Plaintiff's Need for Clean Clothes.**

Plaintiff alleged that he asked Defendant Evans to get him clean clothes and she told him to talk to Defendant Powell, Plaintiff's unit manager at the time. (Jinks Dep., p. 24, lines 4-23.) Plaintiff testified that Defendant Evans provided clean clothing to some unnamed prisoners on an unknown date, but would not provide clean clothes to Plaintiff. (Id. at 25-26.) "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." Alfred v. Bryant, 378 F. App'x 977, 979 (11th Cir. 2010) (citing Farmer v. Brennan, 511 U.S. 825, 832 (1994)). At a minimum, the Eighth Amendment requires prison officials to provide adequate food, clothing, shelter, and medical care. Id. A prisoner's safety must also be protected through reasonable measures. Id.

To prove a claim for deliberate indifference under the Eighth Amendment, Plaintiff must satisfy an objective and a subjective component. To satisfy the objective component, the prisoner bears the burden of proving that the challenged prison condition is "extreme" and "pose[s] an unreasonable risk of serious damage to the [prisoner's] future health or

safety." Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004) (quotation marks and citation omitted). In order to violate the Eighth Amendment, the risk of harm from the condition must be "so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." Id. (quotation marks and citation omitted).

Plaintiff must satisfy a subjective prong by showing that the prison officials acted with deliberate indifference. Id. This does not require that the prison official purposefully acted to cause harm, but it does involve something beyond mere negligence. Id. The prison official must know of and disregard an "excessive risk to inmate health or safety." Farmer, 511 U.S. at 837. In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." Id. A prison condition does not violate the Eighth Amendment unless it involves "the wanton and unnecessary infliction of pain." Chandler, 379 F.3d at 1289 (quotation marks and citation omitted).

Here, the undisputed facts show that Plaintiff cannot satisfy either the objective or subjective component of an Eighth Amendment deliberate indifference claim against Defendant Evans for not providing cleaner clothing. First, Plaintiff's alleged dirty clothing is not an extreme condition, nor did it pose a risk of harm so grave as to violate contemporary standards of decency. Even Plaintiff admitted that clothes are washed twice a week and sheets are washed once a week, (doc. no. 11, p. 7). See, e.g., Jinks v. Owens, 517 F. App'x 913, 915 (11th Cir. 2013) (finding no deliberate indifference where prisoner's bed sheets and clothing were washed weekly, he showered three times a week, he had unlimited access to clean water from cell sink, and he was able to clean his cell). Although Plaintiff testified that his clothing came back "filthier" than when he placed them in the wash, "a prisoner's mere

discomfort, without more, does not offend the Eighth Amendment." <u>Chandler</u>, 379 F.3d at 1295. The condition described by Plaintiff simply does not constitute an extreme condition that poses an unreasonable risk of serious damage to his future health or safety.

Second, Plaintiff has not established that Defendant Evans acted with deliberate indifference because it is undisputed that her job responsibilities do not include the laundry program. Plaintiff's allegation that Defendant Evans is responsible based on his vague and conclusory testimony that Defendant Evans provided some clean clothing to some unnamed prisoners on an unknown date is insufficient to create a genuine issue of material fact. (Jinks Dep., pp. 25-26.) Plaintiff does not dispute that (1) prisoners are assigned the task of cleaning clothes in the laundry facility at WCF, (2) unit managers are responsible for issuing Plaintiff clothing and handling requests regarding clothing, and (3) Defendant Evans had nothing to do with clothing or the condition of clothing. (<u>Id.</u> at 13, lines 10-21, p. 14, lines 4-13, p. 24, lines 20-23; Decl. Evans ¶ 11.)

Moreover, although the clothes were not cleaned to Plaintiff's satisfaction, there is no evidence that Defendant Evans knew about or disregarded any substantial risk of serious harm to Plaintiff. The undisputed evidence shows that prison officials made reasonable efforts to provide clean clothing to Plaintiff and all prisoners. Accordingly, when drawing all justifiable inferences in Plaintiff's favor, no genuine issue of material fact remains as to Plaintiff's Eighth Amendment claim against Defendant Evans, and she is entitled to summary judgment.

**C. Motion for Summary Judgment Filed by Defendants Medlin, Harris, Quinn, Bryant, Smith, Clark, Powell, and Miles**

**1. No Reasonable Juror Could Find that Defendant Medlin Retaliated Against Plaintiff**

Plaintiff alleged that Defendant Medlin retaliated against him in two ways for filing grievances about the conditions of his confinement and having two lawsuits pending: (1) placing him in segregation twice from August through November 2012 for two "frivolous" disciplinary charges that "never went to court" so that he could not work on his pending cases; and (2) placing him in segregation and denying him visitation privileges even though he was found not guilty of the underlying disciplinary charge of exposure. (See doc. no. 11.) Here, the undisputed facts show that Plaintiff cannot satisfy the elements of a First Amendment retaliation claim against Defendant Medlin with respect to either of these claims.

**a. Placement in Segregation from August through November 2012 for "Frivolous" Charges**

Plaintiff alleged that Defendant Medlin placed him in segregation for two "frivolous" insubordination charges from August through November 2012 so that he could not work on an appellate brief in his pending civil rights suit or prepare for a November 7, 2012 hearing in his state habeas corpus action. As detailed in § IV.B.1, *supra*, the elements of a retaliation claim are as follows: (1) Plaintiff's speech was constitutionally protected; (2) Plaintiff suffered adverse action that would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the adverse action and Plaintiff's speech. O'Bryant, 637 F.3d at 1212. Plaintiff satisfies the first element, but not the second element, and he has offered no evidence to support a causal link as required by

the third element.

First, Plaintiff was engaging in protected speech by filing grievances and lawsuits. Redd v. Conway, 160 F. App'x 858, 862 (11th Cir. 2005) ("The First Amendment protects inmates from retaliation by prison officials for filing lawsuits or administrative grievances.")

Second, placement in segregation while officials investigate a disciplinary charge is not the type of adverse action that would likely deter a person of ordinary firmness from engaging in such speech. This is especially true here because the segregation status to which Plaintiff was briefly assigned was administrative and nonpunitive. (Decl. Medlin ¶ 8.)

Third, there is no causal relationship between Plaintiff's filing of lawsuits and grievances and the action he alleges to be retaliatory. Under this factor, Plaintiff must first meet his burden of establishing that his protected conduct was a motivating factor behind any harm. If Plaintiff meets this burden, in order to prevail at summary judgment, Defendant must show that he would have taken the adverse action against Plaintiff even in the absence of the protected conduct.

Here, Plaintiff cannot meet his initial burden that his filing of lawsuits and grievances was a motivating factor behind his placement in segregation. It is undisputed that Plaintiff was charged with insubordination in August and September 2012. (Jinks Dep. p. 12, lines 1-4; doc. no. 75, pp. 5-6.) Plaintiff has also not refuted the declarations of Defendants Medlin and Harris that Plaintiff was automatically assigned to administrative, nonpunitive segregation because he was charged with insubordination, pursuant to WCF policy, pending the investigation of each disciplinary charge. (Decl. Harris ¶ 6; Decl. Medlin ¶ 6.) Additionally, Plaintiff conceded that Defendant Medlin (1) neither wrote the disciplinary charges that let to him being placed in segregation from August to November (2) nor knew

about Plaintiff's pending cases until the beginning of September, after Plaintiff was already in administrative segregation, when Plaintiff showed Defendant Medlin two court orders. (Id. at 10, lines 6-25, p. 11, lines 24-25, p. 12, line 1.)

Plaintiff has also not refuted Defendant Medlin's declaration that, pursuant to CCA Policy 14-08, Plaintiff could still access legal materials while in segregation by merely requesting specific materials. (Decl. Medlin ¶ 9.) In addition, it is undisputed that Plaintiff suffered no injury as a result of the administrative segregation because (1) the Eleventh Circuit gave him additional time to file his appellate brief in the civil rights suit, then denied the appeal on the merits; and (2) Plaintiff was able to attend the evidentiary hearing in his habeas action, and the habeas court denied the petition on the merits. (See Exs. J, L.) For all these reasons, no reasonable juror could find that Defendant Medlin was responsible for Plaintiff's placement in segregation, much less that he was motivated by a desire to retaliate.

Furthermore, Defendant has met his burden by demonstrating that Plaintiff would have been placed in segregation absent his filing of grievances and lawsuits. It is undisputed that Plaintiff would have been placed in administrative, nonpunitive segregation even in the absence of his civil rights suit or grievances because he was charged with insubordination by prison officials other than Defendant Medlin and placed in nonpunitive segregation pursuant to WCF policy. (Decl. Harris ¶ 6; Decl. Medlin ¶ 6.) Plaintiff does not allege, or submit any evidence to suggest, that Defendant Medlin colluded with others to fabricate the insubordination charge so that Plaintiff would be placed in nonpunitive segregation.

### b.    Placement in Segregation and Denial of Visitation Privileges.

Plaintiff alleged that he was charged with, and found not guilty of, exposure sometime in December 2012, but Defendant Medlin revoked his visitation rights anyway based on this meritless charge because of the two pending lawsuits and prison grievances. (Doc. no. 11, p. 12.)  Plaintiff's vague and speculative allegations were that, in essence, Defendant Medlin conspired not only to trump up charges of exposure against him, but also to ultimately revoke his visitation privileges for an unspecified period of time for that charge even after he was found not guilty.  His complaint and testimony on this claim were so conclusory and unsupported by any factual allegations that it has been difficult for Defendant Medlin to respond at summary judgment.  (See doc. no. 75.)  However, even assuming such a conspiracy occurred, Plaintiff's threadbare allegations satisfy only the first element, that Plaintiff was engaging in protected speech by filing grievances and lawsuits.  Redd, 160 F. App'x at 862 ("The First Amendment protects inmates from retaliation by prison officials for filing lawsuits or administrative grievances.")  Plaintiff has offered no evidence to demonstrate either an adverse action of sufficient severity or a causal link as required by the second and third elements, respectively.

As to the second element, Plaintiff did not suffer an adverse action that likely would deter a person of ordinary firmness from engaging in such speech.  Although not a model of clarity, it appears that Plaintiff alleges his visitation rights were revoked for a short period of time within the month of December 2012.  (Doc. no. 11, p. 12.)  Such a short-term deprivation would not deter an ordinary person from continuing to litigate pending civil rights and habeas cases, or from pursuing prison grievances alleging violations of prisoner rights.  Indeed, the record shows that Plaintiff continued to file grievances and prosecute his

two civil cases even after his visitation privileges were allegedly revoked. Plaintiff filed this very lawsuit on September 13, 2013, after Defendant Medlin purportedly revoked his visitation privileges and while he was still incarcerated at WCF. (Doc. no. 1.) In the face of those undisputed facts, no reasonable juror could find that a person of ordinary firmness would likely be deterred from engaging in such speech. See Mitchell v. Thompson, 564 F. App'x 452, 457 (11th Cir. 2014) (holding no retaliation by prison official denying grievance where plaintiff continued to file grievances).

Third, there is no causal relationship between Plaintiff's filing of lawsuits and grievances and the denial of his visitation privileges. Plaintiff cannot meet his initial burden of proving that his filing of lawsuits and grievances was a motivating factor behind his placement in segregation. Defendant Medlin testified that if he revoked Plaintiff's visitation rights, he did so for management and security reasons, not to punish him for filing any lawsuits or grievances. (Decl. Medlin ¶ 7.) In the face of this unequivocal testimony, Plaintiff offers nothing other than his general averment of retaliatory motive. (Jinks Dep., p. 21, lines 20-21.)

For all of these reasons, Defendant Medlin is entitled to summary judgment on this claim.

### 2. No Reasonable Juror Could Find that Defendant Harris Retaliated Against Plaintiff by Charging Him with a Higher Level Offense than He Was Guilty of Committing.

Plaintiff also alleged Defendant Harris placed him in segregation in retaliation for filing lawsuits and grievances, which caused him to miss his mother's funeral. In March 2013, Defendant Harris filed a disciplinary report against Plaintiff, but the nature of the charge is unclear. (Doc. no. 11, p. 12.) Plaintiff conceded that there was some merit to the

charge because he was insubordinate during a heated discussion with Defendant Harris, but Plaintiff alleged she charged him with a higher level offense in retaliation for his civil rights lawsuit and his filing of prison grievances at WCF. (Id.) As with Defendant Medlin, Plaintiff cannot satisfy the second and third prongs of a retaliation claim.

As to the second element, Plaintiff did not suffer an adverse action that likely would deter a person of ordinary firmness from engaging in such speech. Plaintiff admitted he was guilty of insubordination, but quibbled with the charge Defendant Harris chose. Although he alleged that the charge was for a higher level offense than insubordination, he did not allege, nor did he attempt to submit evidence showing, the exact charge or that the penalty would have been any different. No reasonable juror could find that a person of ordinary firmness would be deterred from engaging in protected speech in these circumstances.

As to the third element, there is no causal relationship between Plaintiff's filing of lawsuits and grievances and the action he alleges to be retaliatory. Here, Plaintiff cannot meet his initial burden of proving that his filing of lawsuits and prison grievances was a motivating factor behind Defendant Harris charging him with a higher offense. It is undisputed that (1) Defendant Harris filed a disciplinary report against Plaintiff in March 2013, because, by Plaintiff's own admission, he was insubordinate toward Defendant Harris; (2) Plaintiff was automatically assigned to administrative, nonpunitive segregation because of this charge from March 14, 2013, through March 26, 2013, pursuant to WCF policy, during the investigation of the disciplinary charge; and (3) Defendant Harris did not know about Plaintiff's pending civil rights suit or grievances at the time she filed the disciplinary report. (Doc. no. 11, p. 12; Decl. Harris ¶¶ 4-6.)

It is also undisputed that Plaintiff would have been placed in segregation even in the

absence of his filing of prison grievances and lawsuits. Even if Defendant Harris had charged Plaintiff with only insubordination, which Plaintiff concedes he was guilty of, it is undisputed that he would have still been placed in administrative, nonpunitive segregation pending the investigation into the charge, pursuant to WCF policy. (Decl. Harris ¶ 6.) Therefore, Defendant Harris is entitled to summary judgment on this claim.

### 3. Conditions of Confinement Claim Against Defendants Medlin, Powell, Bryant, Harris, Smith, Clark, and Miles.

As discussed more thoroughly in § IV.B.2, *supra*, to prove a claim for deliberate indifference under the Eighth Amendment, Plaintiff bears the burden of showing that: (1) the challenged prison condition is extreme and poses an unreasonable risk of serious damage to his future health or safety—the objective component, (2) the defendant knew of and disregarded an excessive risk to Plaintiff's health or safety—the subjective component. Chandler, 379 F.3d at 1289; Farmer, 511 U.S. at 837. A prison condition does not violate the Eighth Amendment unless it involves "the wanton and unnecessary infliction of pain." Chandler, 379 F.3d at 1289 (quotation marks and citation omitted).

Here, the undisputed facts show that Plaintiff cannot satisfy either the objective or subjective component of an Eighth Amendment deliberate indifference claim against Defendants Medlin, Powell, Bryant, Harris, Smith, Clark, and Miles for the following alleged conditions of confinement, whether considered individually or in combination: (1) insufficient laundry and personal hygiene materials, (2) inadequate food in unsanitary conditions, (3) inadequate time and space to exercise, (4) inadequate cell space due to overcrowding of the jail, (5) insufficient cleaning supplies, (6) unsanitary conditions in the cells and showers, (7) insufficient number of bathrooms, (8) unsafe drinking water, and (9)

dangerous mold and mildew caused by leaks.

        **a.**      **No Reasonable Juror Could Find that Any Alleged Condition of Confinement Posed an Unreasonable Risk of Serious Damage to Plaintiff's Future Health or Safety.**

Plaintiff made a multitude of allegations concerning every aspect of prison life at WCF. These capacious allegations are lacking in critical details such as dates, location within WCF, how often and widespread these conditions occurred, and the severity of the alleged problems. Defendants have responded with a mountain of specifics about the conditions at WCF, and Plaintiff has failed to reply with any specific, countervailing evidence. When one compares Plaintiff's general, conclusory allegations with the overwhelming details presented by Defendants, it is clear that no reasonable juror could find an extreme condition or a risk of harm to Plaintiff so grave as to violate contemporary standards of decency. What follows is a detailed review of the facts that give rise to this inescapable conclusion.

### i.      Laundry

Plaintiff claimed he was denied sufficient laundry privileges because his clothes were only washed twice a week, his bedding was only washed once a week, his clothes came back dirtier after they were laundered, his clothes were not bleached or put in other chemicals to fight off "HIV and other carrying diseases," and that prisoners had to use their personal soap to wash their clothes and dry them on the rails of their cells. (Doc. no. 11, p. 7; Jinks Dep., at 14-15.) The Identical Declarations stated that "all units have two days to wash clothes and one day to wash sheets, and when wash the laundry dont come back clean [sic]," and they were, "[a]lso denied reasonable and minimum clothing." (Doc. nos. 40-45.) These

declarations lack critical and necessary details such as time period, frequency of occurrence, severity, and pervasiveness.

Just as importantly, Plaintiff has not disputed Defendants' declarations that (1) prisoners place their dirty laundry in net bags as needed, (2) clothes are washed twice a week and sheets are washed once a week in commercial washers and dryers, with commercial laundry products, and (3) the laundered clothes are then returned to the prisoners, (Decl. Medlin ¶ 8; Decl. Powell ¶ 4; Decl. Powell ¶ 3). If Plaintiff was wearing unclean or unsanitary clothing, or if he was missing items issued to him, Defendant Powell would have asked unit staff to see if he needed new items issued and asked why Plaintiff's clothes were missing or not clean. (Decl. Powell ¶ 3.) If Plaintiff had not damaged or disposed of clothing, then staff would have provided new items of clothing. (Id.) Nevertheless, Defendants Powell, Medlin, and Bryant never saw Plaintiff in unclean clothing or less than a full outfit. (Decl. Medlin ¶ 8; Decl. Powell ¶ 3; Decl. Bryant ¶ 6.)

No reasonable juror could find that the laundry conditions at WCF were so lacking in cleanliness as to violate contemporary standards of decency. Although Plaintiff testified that his clothing came back "filthier" than when he placed them in the wash, "a prisoner's mere discomfort, without more, does not offend the Eighth Amendment." See Jinks, 517 F. App'x at 915 (finding no deliberate indifference where prisoner's bed sheets and clothing were washed weekly).

### ii.    Personal Hygiene Items

Plaintiff alleged in the amended complaint, and testified at his deposition, that he only received small amounts of soap, toothpaste, and deodorant on a weekly basis, which lasted only three days. (Doc. no. 11, p. 10; Jinks Dep., pp. 14-15.) The Identical Declarations

stated that indigent prisoners at WCF were issued a small bar of soap, a small tube of toothpaste, and a small bar of deodorant, but the declarations lack critical and necessary details such as time period and frequency of occurrence. (Doc. nos. 40-45.)

Furthermore, it is undisputed that (1) Plaintiff received free, basic hygiene items, including a toothbrush, soap, razors, and toothpaste, (2) the size and composition of the free supplies, which are supplied by a prison vender, are the same as other prisoners at WCF and in other prisons, (3) these free items are not intended to last for a long time and are reissued as needed by unit counselors, upon request of the prisoner. (Decl. Medlin ¶ 8; Decl. Bryant ¶ 6.) Moreover, Plaintiff does not dispute Defendant Medlin's declaration that larger personal hygiene items are available for purchase from the prison store. (Decl. Medlin ¶ 8.) It is also undisputed that even when Defendant Medlin suspended the issuance of razor blades because of security problems due to prisoners misusing sharpened razor blades, the prisoners were still allowed to utilize sterilized clippers to shave. (Id.)

In the face of these undisputed facts, no reasonable juror could find that personal hygiene materials at WCF are so lacking in quality and quantity as to violate contemporary standards of decency. See, e.g., Harris v. Fleming, 839 F.2d 1232, 1235 (7th Cir. 1988) (finding no Eighth Amendment violation when inmate stayed 28 days in filthy, roach-infested cell, was without toilet paper for five days, and was without soap, toothbrush, and toothpaste for ten days). Indeed, while the issuance of these free hygiene products on a weekly basis alone is sufficient to pass constitutional muster, Plaintiff has not disputed the declarations of Defendants that he could have received supplemental supplies during the week by merely asking his unit counselor. (Decl. Bryant ¶ 6.)

### iii.    Food

Plaintiff alleged in the amended complaint that he received "food trays not up to the full level" and was thus denied "his 2,000 calories per serving a day of nutritional value to preserve his health." (Doc. no. 11, p. 7.) The Identical Declarations merely repeated this allegation and lack critical and necessary details such as time period, and frequency of occurrence. (Doc. nos. 40-45.)

It is undisputed that (1) WCF's food service is operated by a nationwide vendor that provides supplies, personnel, cooks, and serves food with the aid of prisoner labor, (2) the amount of food served and the menu is carefully controlled to provide adequate nutrition and meets national guidelines for caloric intake and variety, (3) prisoners routinely get approximately 2,000 calories per day on the standard WCF menu, and (4) some members of the prison staff also eat the same meals prepared in the same kitchens. (Decl. Medlin ¶ 8.) While the Identical Declarations stated that the food trays were not full, there is no evidence in the record to show that a tray must be full to provide the necessary calories. (Doc. nos. 40-45.)

As to the allegedly unsanitary eating conditions, the Identical Declarations state that (1) meat is tainted because it is red on the inside and green on the outside, (2) bread is moldy, (3) milk products are spoiled, and (4) the "chow hall" has dirty tables, chairs, cups, spoons, and trays, and blowflies in the summertime. (Doc. nos. 40-45.) Once again, the Identical Declarations lack critical and necessary details such as location, time period, frequency of occurrence, and severity of the problem. (Id.) Moreover, Plaintiff does not dispute Defendant Medlin's declaration that WCF is subject to (1) routine health department inspections and testing, (2) routine inspection by Corrections Corporation of America, (3)

audits by the American Correctional Association, and (4) unannounced audits by the Georgia Department of Corrections. (Decl. Medlin ¶ 8.) Defendants attach evidence showing that (1) WCF received a grade of "A" in each of their biannual inspections in 2013 and 2014 from the Georgia Department of Public Health, and (2) no rats were found at WCF during monthly inspections and pest solution applications by Allgood Pest Solutions. (Doc. no. 75-2, pp. 67-70, 71-82.) Nor does Plaintiff dispute that a Georgia Department of Corrections contract monitor is physically located at the prison at all times and monitors these food conditions. (Decl. Medlin ¶ 8.)

In light of these detailed and undisputed facts, no reasonable juror could find that the food program at WCF was extreme or posed a risk of harm to Plaintiff so grave as to violate contemporary standards of decency. See Hamm v. DeKalb Cnty., 774 F.2d 1567, 1575 (11th Cir. 1985) (finding no conditions of confinement claim where food occasionally contained foreign objects and prison often failed to meet Georgia Department of Human Resources Food Preparation Standards).

### iv.        Recreation

Plaintiff alleged in the amended complaint, and the Identical Declarations stated, that prisoners were denied reasonable and minimum outdoor recreation because they were allowed only two to three hours per week in a small yard that contained insufficient equipment and was overcrowded. (Doc. no. 11, p. 9; doc. nos. 40-45.) Defendants respond with undisputed evidence that (1) each unit or dormitory at WCF has an attached, enclosed outside exercise area, (2) WCF also has a gym and a larger "yard" exercise area, and (3) prisoners housed in segregation use individual, fenced exercise areas similar to other prisons in Georgia and other states. (Decl. Medlin ¶ 8; Decl. Bryant ¶ 6.) Defendants also

present evidence that, contrary to Plaintiff's allegations, prisoners in segregation are allowed at least one hour a day outside for exercise, if weather permits and if there is no conflict with the ordinary schedule. (Id.) Plaintiff does not dispute that WCF employs a coordinator whose sole job is to coordinate sports and activities. (Decl. Medlin ¶ 8.)

Even when Plaintiff's description of the recreation program is taken as true, without regard to the detailed rebuttal by Defendants, no reasonable juror could find these conditions to be extreme or to pose a risk of harm to Plaintiff so grave as to violate contemporary standards of decency. See Bass v. Perrin, 170 F.3d 1312, 1317 (11th Cir. 1999) (finding complete denial of outdoor exercise did not violate Eighth Amendment where plaintiffs could exercise in confinement cells and booklets detailing proper methods of exercise while in confinement were made available).

### v. Cleaning Supplies and Cell Conditions

Plaintiff alleged in his amended complaint that WCF had insufficient cleaning supplies to remedy the unsanitary cell conditions. (Doc. no. 11, p. 10.) However, Plaintiff does not dispute that (1) WCF issues cleaning products that are standard issue in the prison industry to prisoners in individual cells, who are required to clean and maintain cells themselves, (2) common areas are maintained by prisoners that WCF assigns as orderlies and inspected daily by Defendant Medlin or an on-duty officer, and (3) in open dormitories, prisoners have to maintain the immediate area of their bunks, but orderlies clean the common areas, which are also inspected daily. (Decl. Medlin ¶ 8; Decl. Bryant ¶ 6; Decl. Smith ¶ 3.) Defendant Bryant, Unit Manager, does not recall Plaintiff complaining to him about not having cleaning supplies. (Decl. Bryant ¶ 6.) The underlying facts show that these conditions were not extreme, nor did they pose a risk of harm to Plaintiff so grave as to

violate contemporary standards of decency.  See Alfred, 378 F. App'x at 980 (no conditions of confinement claim where unsanitary conditions in cell caused by occasionally overflowing toilet were mitigated by provision of cleaning supplies to prisoner); Jinks, 517 F. App'x at 915 (finding no deliberate indifference where prisoner was able to clean his cell with soap and water).  No reasonable juror could find that cell conditions at WCF are so lacking in quality and cleanliness as to violate contemporary standards of decency.

### vi.    Shower Conditions

Plaintiff alleged in his amended complaint, and the Identical Declarations stated, that sometimes prisoners urinated and defecated in the showers.  (Doc. nos. 11, 40-45.)  Plaintiff attributed this to overcrowding and understaffing.  (Doc. no. 11, p. 10.)  However, it is undisputed that (1) the showers are inspected frequently, and (2) the showers are cleaned on the rare occasion that a prisoner improperly uses it.  (Decl. Medlin ¶ 8; Decl. Bryant ¶ 6.) Furthermore, Plaintiff does not dispute Defendant Medlin's declaration that he has not seen unclean and unsafe shower conditions that were not cleaned expeditiously.  (Decl. Medlin ¶ 8.)  As to the allegedly inadequate space due to overcrowding of the prison, Plaintiff does not dispute that the prison was built for a population larger than is housed there.  (Decl. Bryant ¶ 6.)  In light of these undisputed facts, no reasonable juror could find that shower conditions at WCF were extreme or posed a risk of harm to Plaintiff so grave as to violate contemporary standards of decency.  See Ivory v. Warden, Governor of Alabama, 600 F. App'x 670, 677 (11th Cir. 2015) (no conditions of confinement claim where prisoner alleged insufficient number of showers because 110 to 120 inmates had only two hours total to shower).

### vii.     Number of Bathrooms

Plaintiff alleged in his amended complaint, and the Identical Declarations stated, that there were too few toilets, with three units each having five toilets and one urinal for eighty prisoners, which caused long lines.  (Doc. nos. 11, 40-45.)  However, it is undisputed that (1) in open dormitories, although there are not enough toilets for every prisoner to use them at once, the number of toilets is comparable to a college dormitory or high school gym or bathroom, and (2) each single cell has a toilet and a sink for either one or two occupants. (Decl. Medlin ¶ 8; Decl. Bryant ¶ 6.)  No reasonable juror could find, in light of these undisputed facts, that the bathrooms at WCF are so lacking in quantity as to violate contemporary standards of decency.  See Ivory, 600 F. App'x at 677 (no conditions of confinement claim where prisoner alleged insufficient number of toilets); see also Bennett v. Croft, No. 1:06 CV 2912 CAM, 2007 WL 81825, at *3 (N.D. Ga. Jan. 4, 2007) (finding no conditions of confinement claim where there was only one toilet and sink per twenty-five bunks).

### viii.     Drinking Water

Plaintiff alleged in his amended complaint, and the Identical Declarations stated, that sometimes the water at WCF was brown.  (Doc. nos. 11, 40-45.)  However, it is undisputed that (1) the water at WCF is the same water used by the citizens of Alamo, Georgia, the town in which the prison is located, and is purchased from the city, (2) the water is inspected by the health department, (3) the health department never told Defendant Medlin that the water in the city or at WCF was not safe to drink, (4) a recent water sample bacteriological analysis showed that the water was absent of any fecal coliform or E. coli.  (Decl. Medlin ¶ 8.)  Nor does Plaintiff dispute the declarations of Defendants Medlin and Bryant that they saw the

drinking water daily and drank the water.  (Id.; Decl. Bryant ¶ 6.)  Plaintiff also does not

dispute Defendant Medlin's declaration that he did not see brown water, but, just as with

civilian facilities, there may have been occasions when the maintenance staff worked on the

water system and the water color might have been impacted immediately after.  (Decl.

Medlin ¶ 8.)  Occasionally discolored water does not constitute an extreme condition, nor did

it pose a risk of harm to Plaintiff so grave as to violate contemporary standards of decency.

No reasonable juror could find that the water at WCF is so lacking in quality as to violate

contemporary standards of decency.

### ix.        Leaks, Mold, and Mildew in Unit 400

Plaintiff testified that he complained to Defendants Quinn and Bryant numerous times

that in Unit 400 (1) there was mildew on the walls and (2) when it rained, there were leaks

and they had to put mop buckets on the floor, but puddles still formed on the floor.  (Jinks

Dep., pp. 14-15.)  Like all of Plaintiff's allegations, these lack critical details such as time

period, frequency of occurrence, and severity of the problem.

However, it is undisputed that WCF is (1) inspected on a daily basis by staff, (2)

routinely examined by maintenance staff, (3) subject to CCA inspection and audits, (4)

subject to unannounced audits and inspections by the Georgia Department of Corrections,

and (5) monitored by a full-time, onsite Georgia Department of Corrections inspector.  (Decl.

Powell ¶ 5.)  Defendant Medlin stated, without challenge by Plaintiff, that he (1) toured the

unit frequently, if not daily, as did other management staff, (2) would have directed the

maintenance department to fix any leaks had he seen mold or mildew, and (3) allowing leaks

from any source would damage the property and would not have been allowed.  (Decl.

Medlin ¶ 8.)  Defendants Bryant and Powell, Unit Managers, also do not recall any condition

going unrepaired or there being mold and mildew in prisoner areas in Unit 400. (Decl. Powell ¶ 5; Decl. Bryant ¶ 6.)

Plaintiff's only testimony as to the leaks was that when it rained, there were leaks and they had to put mop buckets on the floor, but puddles still formed on the floor and caused mildew in the halls. (Jinks Dep., pp. 14-15.) No reasonable juror could find that the conditions are so lacking in quality and cleanliness as to violate contemporary standards of decency even when one accepts as true the vague assertions of episodic leaks and mildew. See Ivory, 600 F. App'x at 674 (11th Cir. 2015) (no conditions of confinement claim where prisoner alleged floors were always "wet, slimy, and slippery"); see also Harris v. Campbell, No. 2:05-CV-0496-MEF, 2007 WL 1668814, at *3 (M.D. Ala. June 8, 2007) (finding no conditions of confinement claim where plaintiff alleged prison was overcrowded, roof of his dorm leaked when it rained, sometimes there was standing room only in chow hall, and dorms had insufficient restroom facilities).

> **b.** **No Reasonable Juror Could Find that Defendants Knew of or Disregarded an Excessive Risk to Plaintiff's Health or Safety.**

Even if Plaintiff had alleged prison conditions so severe as to pose a serious risk to his health or safety, he cannot show that any Defendant acted with deliberate indifference. To satisfy the subjective prong of an Eighth Amendment conditions of confinement claim, Plaintiff must show that a defendant knew of and disregarded an excessive risk to Plaintiff's health or safety.

The undisputed evidence, as summarized thoroughly in § III.B, *supra*, shows that the Defendants made comprehensible and reasonable efforts to provide Plaintiff and all prisoners with safe and sanitary conditions of confinement. (See Decl. Evans; Decl. Medlin; Decl.

Powell; Decl. Bryant; Decl. Clark; Decl. Smith; Decl. Harris.)  Even Plaintiff conceded that prison officials routinely conducted inspections to determinethe condition of prisoner clothing, the prisoners' personal appearance, and whether the dormitory was clean.  (Jinks Dep., p. 13, lines 15-22.)  Furthermore, Plaintiff's medical records also contain no objective findings of illness or injury from the effects of any condition he alleges.  (Decl. Clark ¶ 5.) Any failure of the prison's comprehensive policies and practices to ensure cleanliness and well-being of prisoners constitutes, at most, mere negligence.  See Chandler, 379 F.3d at 1289 (holding the subjective prong of conditions of confinement claim involves something beyond mere negligence).

Plaintiff alleged, in the most vague and general fashion, that three of the nine Defendants (Bryant, Smith, and Miles) knew about one or more of the conditions because he complained to them, and that they did nothing in response to address his complaints.  (Jinks Dep., pp. 15-17, p. 20, lines 5-15.)  There is no evidence to suggest that the remaining defendants had actual knowledge of Plaintiff's complaints.  As to Defendants Bryant, Smith, and Miles, there is no evidence to suggest that they had any authority or responsibility to oversee any of the conditions about which Plaintiff complained.  Even if there was such evidence, their failure to accommodate Plaintiff's subjective complaints of prison conditions cannot constitute more than mere negligence in the face of the overwhelming, undisputed evidence regarding the overall conditions at WCF and the many policies and practices implemented at WCF to ensure Constitutional conditions of confinement.

Thus, when drawing all justifiable inferences in Plaintiff's favor, no genuine issue of material fact remains as to Plaintiff's Eighth Amendment claims against Defendants Medlin, Miles, Quinn, Harris, Clark, Smith, Bryant, and Powell.

**D.    Even If Plaintiff's Claims Survived Summary Judgment, No Reasonable Juror Could Find That He Suffered Physical Injuries, and He Cannot Recover Compensatory or Punitive Damages.**

"No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).  The statute's clear and broad language encompasses all claims, including constitutional claims, and provides for no exceptions.  Al–Amin v. Smith, 637 F.3d 1192, 1197 (11th Cir. 2011) (precluding plaintiff from offering evidence to support award of punitive damages for alleged First Amendment violation where he did not allege physical injury).  In the Eleventh Circuit, no distinction is made between "constitutional claims frequently accompanied by physical injury (e.g., Eighth Amendment violations) and those rarely accompanied by physical injury (e.g., First Amendment violations)[;]" all constitutional claims are treated equally.  Id.

"In order to avoid dismissal under § 1997e(e), a prisoner's claims for emotional or mental injury must be accompanied by allegations of physical injuries that are greater than *de minimis*."  Mann v. McNeil, 360 F. App'x 31, 32 (11th Cir. 2010) (holding that § 1997e(e) barred prisoner's claims for monetary damage because prisoner's complaints of vague injuries to back and scrapes and marks on knees and legs did not amount to more than *de minimis* physical injury); Nolin v. Isbell, 207 F.3d 1253, 1258 n.4 (11th Cir.2000) (bruises received during arrest were non-actionable *de minimis* injuries); Quinlan v. Personal Transp. Servs. Co., 329 F. App'x 246, 249 (11th Cir. 2009) (barring claims for compensatory and punitive damages despite complaints of temporary chest pain, headache, difficulty breathing, and continuous back pain because conditions did not require immediate medical attention or evidence physical injury besides discomfort).    Nevertheless, "[n]ominal damages are

appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages." Hughes v. Lott, 350 F.3d 1157, 1162 (11th Cir. 2003).

Here, Plaintiff merely states he suffered "aguish, misery, and pain" from violation of his constitutional rights. (Doc. no. 11, p. 6.) Nowhere does Plaintiff allege that he suffered any physical injury as the result of the alleged conditions of confinement claim or retaliation, nor do his medical records show that he suffered any injury as a result. (See doc. no. 11; Decl. Clark ¶ 5.) Therefore, because Plaintiff has not alleged a physical injury that is greater than *de minimis*, he cannot recover compensatory and punitive damages and is limited to nominal damages even if the claims could survive summary judgment. Al–Amin, 637 F.3d at 1197; Mann, 360 F. App'x at 32; Hughes, 350 F.3d at 1162.

## V. CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that Defendants' motions be **GRANTED** (doc. nos. 71, 75), a final judgment be entered in favor of Defendants, and this civil action be **CLOSED**.

SO REPORTED and RECOMMENDED this 7th day of August, 2015, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA